**SHELLER, P.C.**
**(Incorporated in Pennsylvania)**
Brian J. McCormick (BJM 0031)
Stephen A. Sheller, Esquire
1528 Walnut Street, Floor 4
Philadelphia, PA 19102
Phone: (215) 790-7300
Fax: (215) 546-0942

**Attorneys for Plaintiff-Relator**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex. rel.* ▉▉▉▉▉▉▉▉ | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| Plaintiffs, | |
| v. | Civil A. No. 1:11-cv-07543-JBS-AMD |
| WAMIQ S. SULTAN, M.D., ROMAN KROL, M.D., and THE MEMORIAL HOSPITAL OF SALEM COUNTY, APOGEE PHYSICIANS and DOES 1-50 | **AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE *QUI TAM* PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT** |
| Defendants. | JURY TRIAL DEMANDED |

Plaintiff-Relator ▉▉▉▉▉▉▉ ("Relator" or "Plaintiff") brings this

action, on behalf of the United States of America and the state of New Jersey, against

Defendants Wamiq Sultan, M.D., individually, Roman Krol, M.D., individually, The

Memorial Hospital of Salem County, Apogee Physicians and Does 1-50 ("Defendants")

to recover monies that Defendants wrongfully obtained from federal healthcare programs

through false or fraudulent claims for payment.

For his causes of action, Plaintiff alleges as follows:

1

## NATURE OF ACTION

1.      This case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA") and New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*

2.      Relator brings this action to recover losses from false claims submitted to the United States and the State of New Jersey as a result of the sustained fraudulent conduct of Defendants.

3.      Relator brings this action to recover statutory treble damages and civil penalties under the FCA.

4.      Finally, Relator also brings this action to recover all available damages and other monetary relief under the common law or equitable theories of unjust enrichment and payment by mistake of fact.

5.      Relator alleges that Defendants knowingly submitted thousands of false claims to the United States and the State of New Jersey for reimbursement which resulted in millions of dollars of reimbursement that would not have been paid but for the Defendants' misconduct.  Relator believes, and therefore alleges, that such misconduct has been occurring for more than four years, and continues to occur presently.

6.      Under the FCA, a private person may, under certain circumstances, bring an action in federal district court for himself/herself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b).  That private person is known as a relator, and the action that the relator brings is called a *qui tam* action.

## PRELIMINARY STATEMENT

7.      This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a

Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

8.       To the extent that there has been a public disclosure unknown to Relator, he is an original source under 31 U.S.C. § 3730(e)(4).  Relator has direct and independent knowledge of the information on which the allegations are based.

9.       Relator voluntarily presented this information to the government prior to filing this lawsuit.

10.      Under the federal False Claims Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least 60 days and shall not be served on Defendants until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty days after the Government receives the Complaint and the material evidence and information.

## JURISDICTION AND VENUE

11.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can all be found in, resides in, and/or transacts business in this District.  In addition, this Court has personal jurisdiction over Defendants because Defendants' acts prohibited by 31 U.S.C. § 3729 *et seq.* occurred within this District.

12.      The United States District Court for the District of New Jersey is the proper venue for this dispute under 29 U.S.C. § 1391(b), since a substantial part of the events and omissions giving rise to the claims occurred in this judicial district.

3

## PARTIES

13.     Plaintiff-Relator ████████████ is an adult individual ████████ ████████████████████████████████████████████ ████████████████

14.     Defendant The Memorial Hospital of Salem County ("Salem County Hospital") is a New Jersey corporation, located at 310 Woodstown Road, Mannington Township, New Jersey 08079, and is a provider of healthcare services.

15.     Salem County Hospital is a 140-bed, acute-care hospital. Salem County Hospital has more than 490 employees and 200 physicians representing more than 30 specialties. It offers 24-hour emergency care, a cardiac catheterization lab, intensive and critical care units and services including wound care, bariatric and laparoscopic surgery, diagnostic imaging, orthopedics and physical therapy. According to its website, Salem County Hospital serves more than 100,000 people in Salem, western Cumberland and southern Gloucester counties in New Jersey.

16.     Salem County Hospital is owned and/or leased by Community Health Systems, Inc. ("CHS"), one of the largest operators of general acute-care hospitals in the United States. Relator has learned that the administration of Salem County Hospital recently informed CHS management of the fraudulent practices described below. However, Relator believes, and therefore alleges, that CHS has known about this illegal conduct since at least 2010.

17.     Defendant Wamiq S. Sultan, M.D. ("Dr. Sultan") is a physician licensed by the State of New Jersey, specializing in nephrology. Dr. Sultan practices medicine at

Salem County Hospital and uses office space within the physical plant of Salem County Hospital. Upon information and belief, Dr. Sultan is a Pakistani citizen.

18. Dr. Sultan sees patients at the Salem County Hospital, but also practices at Cooper University Hospital, Camden, New Jersey. Upon information and belief, as a nephrologist, Dr. Sultan provides, among other things, inpatient evaluation and management services and consultations to critically ill patients and non-critically ill patients.

19. Defendant Roman Krol, M.D. ("Dr. Krol") is a physician licensed by the State of New Jersey, specializing in pulmonology. Dr. Krol practices medicine at Salem County Hospital. Upon information and belief, Dr. Krol has recently joined a physician practice in southern New Jersey -- Garden State Pulmonary Associates, P.A., 310 Woodstown Drive, Floor 4, Salem, New Jersey.

20. Upon information and belief, as a pulmonologist, Dr. Krol provides, among other things, inpatient evaluation and management services and consultations to critically ill patients and non-critically ill patients.

21. Defendant Apogee Physicians ("Apogee") is the largest physician-owned and operated hospitalist group in the nation. Apogee's principal place of business is located at 2525 East Camelback Road, Phoenix, Arizona.

22. Upon information and belief, Apogee has a contract with Salem County Hospital to provide "hospitalists" or internists to the hospital. A "hospitalist" is a specialist in internal medicine who coordinates care for patients in the hospital.

23.     On its website, Apogee claims that it "works in close partnership with the staff at Memorial Hospital of Salem County." Upon information and belief, Apogee also provides physicians to at least five other hospitals in New Jersey.

24.     Defendant Does 1-50 are other physicians or healthcare providers that participated in the course of conduct that is the subject matter of this Complaint. Relator has not, as yet, ascertained the true names of the physicians or healthcare providers sued as Does 1-50, and therefore sues these defendants by using fictitious names. Relator will amend this complaint to allege the true names of the Doe defendants when ascertained.

## THE FALSE CLAIMS ACT

25.     At the time relevant to this suit, the FCA provided, in pertinent part, that

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
> . . .
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . ..
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## NEW JERSEY ACT

26.     The New Jersey False Claims Act provides, in relevant part:

A person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False

6

Claims Act (31 U.S.C. § 3729 *et seq*.), . . ., for each false or fraudulent claim, plus three times the amount of damages which the State sustains, if the person commits any of the following acts:

    a.     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    b.     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    c.     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; . . ..

N.J.S.A. 2A:32C-2.

## THE STARK LAW

27.    Because of the extent to which a physician controls the purchasing options of his or her patients, federal law regulates patient referrals between a physician and an entity in which the physician (or an immediate family member) has a financial interest. The Stark Law, also referred to as the Physician Self-Referral Law, sets forth extensive civil prohibitions on the referrals that a physician can make, nearly all of which are tied in some way to financial gain. The law is designed to provide bright line rules for the physician as a referrer of covered items or services and the physician as an investor.

28.    The Stark Law prohibitions provide in general that if a physician or a member of his or her immediate family has a direct or indirect "financial arrangement with an entity," then two things are prohibited:

        1. The physician "may not make a referral to the entity of certain designated health services" covered by the Medicare program (42 U.S.C. § 1395nn(a)(1)(A); and

        2. The entity "may not present or cause to be presented" a claim to Medicare for any such services following any such referral (42 U.S.C. § 1395nn(a)(1)(B).

29.    Under the Stark Law, a physician has a ***financial relationship*** with an entity if he has either an ownership (or investment) interest in the entity, or has a

7

compensation arrangement with the entity. 42 U.S.C. § 1395nn(a)(2). An ownership or investment interest in the entity may be an equity interest, a debt relationship or an indirect ownership through controlling entities.

30. A "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and the entity. 42 U.S.C. § 1395nn(h)(1)(A).

31. The Stark Law defines "remuneration" broadly to include any remuneration received by a physician directly or indirectly, overtly or covertly, in cash or in kind. 42 U.S.C. § 1395nn(h)(1)(B). The Stark Law excludes from the definition of "compensation arrangement" certain arrangements involving only remuneration consisting of:

> • Forgiveness of amounts owed for inaccurate or mistakenly performed tests or procedures, or the correction of minor billing errors;
>
> • Provision of items, devices, or supplies that are used solely to collect specimens or order procedures for entity; and
>
> • Certain payments from insurers to physicians on a fee-for service basis.

42 U.S.C. § 1395nn(h)(1)(A) and (C).

32. The Stark Law is a strict liability statute that is violated whenever a prohibited referral is made or a claim is submitted based on that prohibited referral, regardless of whether the healthcare provider intended, knew or should have known that the law prohibited the actions it took.

33. The Stark Law contains various "exceptions" to its prohibitions. These "exceptions" are very different in scope from the "safe harbors" in the federal Anti-kickback statute. A proposed referral arrangement involving compensation may fall

8

within a safe harbor to the Anti-kickback Statute, yet be prohibited by Stark and not fit within one of the Stark exceptions. The converse is also true.

34.    As further explained herein, none of the practices at issue in this Complaint qualify for the Stark Law exceptions.

## FEDERAL HEALTHCARE PROGRAMS

35.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg (1999), establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program.  The Secretary of HHS administers the Medicare program through CMS, a component of HHS.

36.    At all relevant times to this Complaint, the Medicare Program was a federally-funded and administered program intended to assist elderly and disabled persons in paying for the cost of healthcare.

37.    The Medicare program is comprised of four parts – Medicare Part A, B, C and D – and works by reimbursing healthcare providers for the costs of service and ancillary items at fixed rates.

38.    The United States provides reimbursement for Medicare claims out of the Medicare Trust Fund.  The Medicare Trust Fund is supposed to reimburse healthcare providers, such as SPA, only for those services that were actually performed, medically necessary for the health of the patient and ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient.  The Medicare Trust Fund relies on the implied representations of the suppliers of Medicare services, reimbursable in whole or in part under Medicare, that the services billed by the providers were medically necessary for the patient and were actually performed as billed and

compensable by Medicare. Medicare requires that the services be physically performed and billed according to Medicare policies and procedures codes.

39.    The federal Medicare regulation excludes from payment services that are not reasonable and necessary. 42 C.F.R. § 411.15(k)(1)

40.    CMS oversees the Medicare program. Regional intermediaries acting for Medicare set the compensation rates for services by assigning a specific amount to each five-digit Medicare code (the "CPT Code"), each of which identifies with particularity the nature of the service performed.

41.    In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called CMS 1500. When the CMS 1500 is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

42.    On a CMS 1500, the provider also must state, among other things, the procedure(s) for which it is billing Medicare using the CPT Code.

43.    All healthcare providers, including offices such as SPA, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services.

## THE MEDICAID PROGRAM

44.    At all times relevant to this Complaint, the Medicaid Program was intended to assist the poor and other qualified persons in paying for the cost of healthcare. Medicaid is a federal-state matching program, in which both the federal and state governments were required to contribute a specified percentage of total expenditures.

45. Medicaid is administered by the individual states.

46. The Social Security Act and federal regulations establish minimum levels of coverage that states must provide in order to operate a Medicaid program. Federal law and regulations also establish optional coverage categories, all or part of which states may choose to cover. Each state covers the required services and eligibility groups, but develops a unique program by determining which optional services and eligibility groups to cover.

47. While states are responsible for the hands-on operation of Medicaid, the federal government plays an active oversight role. CMS oversees the Medicaid Program and federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid Program. In New Jersey, the Agency for Healthcare Administration ("AHCA") is the single state agency responsible for the Medicaid Program.

48. The Medicaid Program in New Jersey works by reimbursing healthcare providers for the cost of services and ancillary items at fixed rates and in a manner similar to that used by the Medicare Program.

**TRICARE**

49. TRICARE is a federally funded medical insurance program for military personnel, retirees, their spouses and unmarried dependent children under the age of 22, administered by TRICARE Management Activity, pursuant to 10 U.S.C. §§ 1071-1107. TRICARE was established by Title 10, U.S.C. Chapter 55 (formerly known as CHAMPUS) and operates in accordance with policies and procedures set forth in Department of Defense TRICARE regulation 6010.8-R, 32 C.F.R Part 199.

11

50.     TRICARE prohibits improper billing practices such as unbundling and/or manipulating CPT Codes as a means to increase reimbursement.  32 C.F.R. § 199.9(c). Such practices are considered fraudulent and abusive and a misrepresentation of services. 32 C.F.R. §§ 199.9(c)(5) – (c)(8).

51.     Any physician providing services and asking TRICARE for reimbursement has an obligation to submit claims for non-covered costs or non-chargeable services disguised as covered.  32 C.F.R. § 199.9(c)(2).  The physician has a further obligation not to submit claims that are fictitious, or include or are supported by any written statement that asserts a material fact that is false or fictitious, or include or are supported by any written statement that omits a material fact that the provider had a duty to include and the claims is false or fictitious as a result of such omissions.  32 C.F.R § 199.2.

52.     Upon information and belief, Defendants received payment under the TRICARE program.

## DEFENDANTS' FALSE CLAIMS SCHEMES

53.     At all times relevant to this Complaint, Defendants sought reimbursement from the Medicare and Medicaid programs and knew of the policies, procedures and criteria for obtaining reimbursement under these programs.  They knowingly violated such policies, procedures and criteria in order to fraudulently obtain greater reimbursement payments than they were entitled to receive.

54.     Beginning as early as 2009, up to and including the date of the filing of this Complaint, Defendants have willfully or with at least reckless disregard or reckless indifference to the truth engaged in several billing schemes designed to defraud the

Medicare and Medicaid programs (the "Programs") by the submission of knowingly false claims to the Programs.

55.    At all times relevant to this Complaint, Defendants sought reimbursement from the Programs and knew of the policies, procedures and criteria for obtaining lawful reimbursement under the Programs' regulations.  Defendants knowingly violated such policies, procedures and criteria to obtain greater reimbursement payments than they were entitled to receive.

56.    Beginning as early as 2009, up to and including the date of the filing of this Complaint, Defendants engaged in several widespread billing schemes intended to defraud the Programs.

57.    Specific examples of some of Defendants' false and fraudulent schemes are set forth below.

### A.    How Consultations Are Billed

58.    The Current Procedural Terminology (CPT) defines a consultation as "a type of service provided by a physician whose opinion or advice regarding evaluation and/or management of a specific problem is requested by another physician or other appropriate source."

59.    A consultation differs from similar evaluation and management services in that a consultation involves a specific request for help with a particular diagnosis or course of treatment on a limited basis, while an office or inpatient visit lacks such a request and can involve ongoing care of a patient.

60.     The CPT defines four types of consultation: (1) office or other outpatient, (2) initial inpatient, (3) follow-up inpatient and (4) confirmatory (also called a second opinion).

61.     As to consultations, Salem County Hospital's Rules and Regulations of the Medical Staff provides, as follows:

### 2.6     CONSULTATIONS

It will be the responsibility of the Attending Physician or surgeon to obtain consultation in those circumstances outlined in the consultation request policy of the hospital.  Consultations shall be obtained through written order of the Attending Physician.  The consultation report shall include evidence of a review of the patient's record by the consultant, pertinent findings on examination of the patient, the consultant's opinion and recommendations (if written must be dictated within 24 hours).  The report shall be made a part of the patient's record.  A limited statement, such as "I concur" does not constitute an acceptable report of consultation.  When operative procedures are involved, the consultation note shall be recorded prior to the operation, except in emergency situation so verified on the record

### B.     Billing for Consultations

62.     Upon information and belief, in submitting health insurance claims to Medicare or Medicaid, Dr. Sultan, Dr. Krol, Apogee and/or Salem County Hospital use a standard health insurance claim form commonly known as a form CMS 1500 ("Form 1500").

63.     In submitting these health insurance claims to Medicare, Dr. Sultan, Dr. Krol, Apogee and/or Salem County Hospital represent the amount of the charges actually incurred by the patient for the services rendered.  The Form 1500 specifically requires providers to describe the service(s) provided, the date of service and the amount of the provider's "charges" for the service(s) rendered.

64.     In submitting the Form 1500 to Medicare, Dr. Sultan, Dr. Krol and/or Salem County Hospital used a CPT code to describe the service(s) rendered.  A CPT code

14

if a five-digit code which identifies and describes the procedures and services performed by the provider in accordance with a systematic listing published by the American Medical Association.

65.     For example, prior to January 1, 2010, CPT Code 99255 was a procedure code that was used to describe a physician consultation given to a non-critically ill patient, which requires at least two of the following three components: (1) a comprehensive history; (2) a comprehensive examination; and (3) medical decision making of high complexity.  Under this description, a physician typically spends approximately sixty (60) minutes at the bedside and on the patient's hospital floor or unit.

66.     Since January 1, 2010, Medicare stopped recognizing CPT codes for consultation services and, instead, requires providers to use other Evaluation and Management (E/M) CPT codes when they provide services that were previously coded as consultations.

67.     In submitting health insurance claims to Medicare, Dr. Sultan, Dr. Krol, Apogee and/or Salem County Hospital certified that the information set forth in the claim was accurate and complete, and that the service(s) provided in accordance with the laws governing the practice of medicine in New Jersey.

## C.     **Defendants' Submission of Claims for Unlawful and Excessive Consults**

68.     Beginning as early as 2009, Dr. Sultan, Dr. Krol and/or Salem County Hospital submitted claims to Medicare for unlawful fees.

69.     Dr. Sultan and Dr. Krol perform consultations on patients who do not require consultations.

70.     Dr. Sultan performs consultations on patients before the patient's physician, or the attending physician, requests a consultation. This is also a HIPAA violation since it requires access to a patient's medical records without an order for the consult.

71.     Upon information and belief, Dr. Sultan has written orders to consult himself, meaning he is both the consulting physician and the physician who ordered the consult.

72.     Dr. Sultan and Dr. Krol also routinely consult each other's patients without the patient needing such care or treatment.

73.     Dr. Sultan persuades other physicians, including physicians from Apogee, to utilize him as a consult, when such care, treatment and/or consult, is unnecessary and redundant. This relationship often leads the initial physician to put the patient on Dr. Sultan's "service", while the initial admitting physician retains consult services for that patient, which again leads to redundant care and overcharging.

74.     Relator has seen statistics at Salem County Hospital showing that Dr. Sultan and Dr. Krol treat many more patients than any other physician at the hospital. Indeed, Relator believes that the statistics are so high as to be almost impractical.

75.     Dr. Sultan and Dr. Krol have changed consultation reports to a "History and Physical" report ("H&P") after an overnight admission.

76.     Relator is aware that Dr. Sultan occasionally made decisions related to discharge based on the length of stay of each patient, rather than the patient's physical condition.

16

77.     On one occasion. Dr. Sultan discharged a certain patient that Relator did not feel was well enough for discharge.  That patient went home and was readmitted two days later for the same condition.

78.     Relator believes, and therefore alleges, that Dr. Sultan also improperly consults with nephrologists from Cooper University Hospital ("Cooper") at Salem County Hospital.

79.     Under an agreement between Cooper and Salem County Hospital, Cooper supplies nephrologists, including Dr. Sultan, to Salem County Hospital.

80.     Dr. Sultan is a nephrologist.  However, when a patient is admitted to or under Dr. Sultan's care at Salem County Hospital, Dr. Sultan consults a nephrologist from Cooper.

81.     Relator believes, and therefore alleges, that Cooper has instructed Dr. Sultan to consult with Cooper nephrologists when one of *his* patients needs treatment or care from a nephrologist, even though Dr. Sultan is a nephrologist.

82.     Additionally, in mid-2011, Dr. Sultan brought Dr. Krol in to perform a pulmonology consult on a female patient named Martinez ("Patient Martinez").

83.     Moreover, Patient Martinez vociferously objected to the consult and clearly told Drs. Krol and Sultan and others that she did not need, or want, a pulmonology consult.

84.     Despite her protestations, Dr. Krol performed the consult, and, Relator believes, billed for it.  Mrs. Martinez was a Medicare patient.

85.     Patient Martinez later complained to Salem County Hospital when she received a bill showing charges for the pulmonology consult.  This complaint was

17

brought to the attention of Marla Maybrook, who formerly served as Salem County

Hospital's Director of Quality Improvement.

### D.   The Peer Review Committee at Salem County Hospital Begins an Internal Audit Related to the Consult Misconduct

86.



87.   The Physician Peer Review Committee "recommended that a letter be sent

to the Medical Staff outlining" issues surrounding the consult procedures at Salem

County Hospital.  The Physician Peer Review Committee also performed an internal

audit of fifty (50) charts that contained consults; thirty-eight (38) of the charts included

unnecessary and/or unrequested consults.

88.   Subsequently, Mohamed Salem, M.D. (Chief of Staff) and Dr. Dayrit

(Chairman, Physician Peer Review Committee) sent a memorandum to "The Medical

Staff of the Memorial Hospital of Salem County" regarding "CONSULTATIONS" (the

"Consultations Memo").

89.   The memo stated that, after an internal audit, "[i]t has been observed that

the section on Consultations (2.5) Rules and Regulations of the Medical Staff has not

always been followed."

18

90.

91.     Ms. Maybrook, Salem County Hospital's former Director of Quality Improvement, was recently terminated in January 2012.  As part of her management duties, Ms. Maybrook was responsible for conducting and leading the audit into issues related to improper consultations.

92.     Relator believes, and therefore alleges, that the above-described issues relating to improper consultations were discussed during Medical Executive Committee meetings at Salem County Hospital.

93.     Relator is aware, and therefore alleges, that an audit beyond the original fifty (50) charts that were examined within the scope of the Peer Review Committee review was conducted, and continues to this day in some format.  The Peer Review Committee has agreed to oversee the audit, but numerous discussions regarding the size and scope of the audit continue.

**E.      Apogee Physicians Participate in Illegal Conduct with Dr. Sultan and Dr. Krol**

94.     Relator believes, and therefore alleges, that physicians from Apogee have a referral relationship with Dr. Sultan where each party performs unnecessary and improper consults for the other.  Since Apogee has several physicians working at Salem County Hospital, Relator cannot identify which particular physicians are included in this improper arrangement.

19

95.     Relator believes, and therefore alleges, that physicians from Apogee accept consultations from Dr. Sultan and Dr. Krol with the expectation that Apogee physicians will then be asked to consult on Dr. Sultan's and Dr. Krol's patients.

96.     ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████

97.     ███████████████████ a telephone conference occurred between Salem County Hospital management, Peter W. Thompson, M.D. (Chief of Clinical Operations, Apogee Physicians Group), Dr. Sultan and several doctors from the local Apogee group that worked at Salem County Hospital to discuss Salem County Hospital's review of issues relating to improper consultations.

98.     Despite the Consultations Memo and other warning, Dr. Sultan, Dr. Krol and several Apogee physicians continue their illegal practices.

**F.     General Allegations Relating to Knowledge and Fraudulent Practices**

99.     Relator believes, and therefore alleges, that the recently-hired CEO of Salem County Hospital, Richard Grogan, is aware of the fraudulent practices and billing described above in this Amended Complaint.

100.    Relator has recently been told that the former CEO of Salem County Hospital, James Angle, was aware of the fraudulent practices and billing described above in this Amended Complaint during his time at the hospital.

101.   Relator also believes, and therefore alleges, that John Amrien, M.D., who serves as Chief of Medicine at Salem County Hospital, is aware of the fraudulent practices and billing described above in this Amended Complaint.

102.   Relator has been in discussions with other physicians at Salem County Hospital where Drs. Sultan and Krol are referred to as physicians who "churn patients."

103.   ███████████████ the management of Salem County Hospital recently informed Neil Heatherly, CHS, Vice President, Division III Operations, of the fraudulent practices and billing described in this Amended Complaint.  Mr. Heatherly manages hospitals for CHS in New Jersey, Pennsylvania and Tennessee.

### G.   Dr. Sultan and Salem County Hospital Are Violating Stark Law

104.   Relator believes, and therefore alleges, that Dr. Sultan is receiving improper and illegal benefits in violation of the Stark Law.

105.   Dr. Sultan does not pay rent for office space at Salem County Hospital.

106.   However, when he is present at Salem County Hospital and/or the Fresenius Medical Care dialysis clinic on Salem County Hospital's grounds, Dr. Sultan sees and treats his own individual patients in the office space rented by Fresenius and/or Cooper.  Upon information and belief, Fresenius and Cooper have a relationship where Fresenius provides dialysis machines and Cooper provides nephrologists to provide the care and treatment.

### COUNT I
### Violations of FCA – Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

107.   ███████████████ re-alleges and incorporates the foregoing allegations as if the same were set forth herein.

108.    This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for the Defendants' violations of 31 U.S.C. § 3729(a)(1)(A).

109.    By virtue of the above-described acts, among others, the Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and upon information and belief, continue to present or to cause to be presented false or fraudulent claims for payment or approval within the meaning of § 3729(a)(1)(A).

110.    The monies the Defendants obtained through their billing for services provided to Medicare beneficiaries were provided in whole or in part by the United States Government, and, for services provided to New Jersey Medicaid beneficiaries were provided by a combination of the United States and State or City governments.

111.    Plaintiff United States, unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States, and in reliance of the accuracy thereof, has paid, and continues to pay, the Defendants for services that would otherwise not have been paid and/or were ineligible for payment.

112.    Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof, paid and continues to pay for the Defendants' unlawful Medicare and Medicaid claims.

113.    The Defendants' compliance with Medicare and Medicaid regulations was material to the governments' decision to disburse funds to the Defendants.

114.   Relator believes and avers that he is an original source of the facts and information on which this action is based.

## COUNT II
**Violations of FCA – Making or Using False Records
or Statements to Cause Claim to be Paid
31 U.S.C. § 3729(a)(1)(B)**

115.   ███████████ re-alleges and incorporates the foregoing allegations as if the same were set forth herein.

116.   This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for the Defendants' violations of 31 U.S.C. § 3729(a)(1)(B).

117.   Through the above-described acts, among others, Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims on the Government, and upon information and belief, continue to engage in such conduct, by accepting and continuing to accept governmental Medicare and Medicaid monies for services.

118.   The Defendants created and/or used false records and/or statements that were material to the Government's decision to pay reimbursements for certain medical services provided to Medicare beneficiaries.

119.   Plaintiff United States, unaware of the falsity of the records or statements made, used, or caused by Defendants, and in reliance on the accuracy thereof, has approved and paid payments to Defendants for healthcare services that otherwise should not have been paid under the Medicaid, Medicare and/or other federal healthcare programs.

120.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages. The United States is entitled to full recovery of the amounts paid by it to the Defendants for the false Medicare and Medicaid claims, plus a penalty of treble damages.

121.    Relator believes and avers he is an original source of the facts and information on which this action is based.

### COUNT III
### Violations of FCA – Conspiracy
### 31 U.S.C. § 3729(a)(1)(C)

122.    ██████████████ realleges and incorporates the foregoing allegations as if the same were set forth herein.

123.    This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for Defendants' violations of 31 U.S.C. § 3729(a)(1)(C).

124.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies to defraud the United States by getting false and fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(3), and, as amended, 31 U.S.C. § 3729(a)(1)(C). Defendants also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced Government obligations to them or resulted in repayments from them to the Medicare program.

125.    Defendants and their agents and employees have taken substantial steps in furtherance of those conspiracies, *inter alia*, by preparing false records, by submitting claims for reimbursement to the Government for payment or approval, and by directing their agents and personnel not to disclose and/or to conceal its fraudulent practices.

126.    The United States, unaware of Defendants' conspiracy or the falsity of the records, statements and claims made by Defendants and their agents and employees, and as a result thereof, has paid and continues to pay millions of dollars that it would not otherwise have paid Defendants for healthcare services that otherwise should not have been paid under the Medicaid, Medicare and/or other federal healthcare programs.

127.    Because of the false records, statements, claims, and omissions by the Defendants and their agents and employees, the United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof, has approved and paid payments to Defendants for healthcare services that otherwise should not have been paid under the Medicaid, Medicare and/or other federal healthcare programs.

128.    As a direct result of Defendants' actions as set forth in the Complaint, the United States has been damaged, with the amount to be determined at trial, and is also entitled to statutory penalties.

129.    Relator believes and avers that he is an original source of the facts and information on which this action is based.

## COUNT IV
### Unjust Enrichment

130.    ███████████████  realleges and incorporates the foregoing allegations as if the same were set forth herein.

131.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

132.    Defendants have been unjustly enriched with federal monies which they should not in good conscience be permitted to retain.

25

133.    By directly or indirectly obtaining federal funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT V
### Violations of FCA, 31 U.S.C. § 3729(a)(1) (as amended)

134.    ██████████████ realleges and incorporates the foregoing allegations as if the same were set forth herein.

135.    This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 (as amended) for Defendants' violations of 31 U.S.C. § 3729(a)(1) (as amended) for acts occurring from May 2009 through the present.

136.    By virtue of the above-described acts, among others, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to government agencies, which ultimately have been paid by the United States within the meaning of Section 3729(a)(1).

137.    These claims were fraudulent for the reasons set forth and described above.

138.    Plaintiff United States, unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States, and in reliance of the accuracy thereof, paid the Defendants for services that would otherwise not have been paid and/or were ineligible for payment.

139.    Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants, and in reliance on the accuracy thereof, has approved and paid payments to Defendants for healthcare services that otherwise

26

should not have been paid under the Medicaid, Medicare and/or other federal healthcare programs.

140.   The Defendants' compliance with Medicare and Medicaid regulations was material to the governments' decision to disburse funds to the Defendants.

141.   By reason of the Defendants' wrongful conduct, the United States has suffered substantial damages.  The United States is entitled to full recovery of the amounts paid by it to the Defendants for the false Medicare and Medicaid claims, plus a penalty of treble damages.

142.   Relator believes and avers that he is an original source of the facts and information on which this action is based.

**COUNT VI**
**FCA, 31 U.S.C. § 3729(a)(2) (as amended)**

143.   ████████████████ realleges and incorporates the foregoing allegations as if the same were set forth herein.

144.   This Count is brought by Relator in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 (as amended) for Defendants' violations of 31 U.S.C. § 3729(a)(2) (as amended) for acts occurring from May 2009 through the present.

145.   Through the above-described acts and otherwise, the Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim on the Government, and upon information and belief, the Defendants engaged in such conduct by accepting governmental Medicare and Medicaid monies for certain medical services improperly provided.

146.   The Defendants created and/or used false records and/or statements that were material to the Government's decision to pay reimbursements for certain medical

services provided to Medicare beneficiaries. The false records and/or false statements influenced or had a natural tendency to influence or were capable of influencing CMS and/or other payors to pay government monies to Defendants.

147.    Plaintiff United States, unaware of the falsity of the records or statements made, used, or caused by Defendants, and in reliance on the accuracy thereof, has approved and paid payments to Defendants for healthcare services that otherwise should not have been paid under the Medicaid, Medicare and/or other federal healthcare programs.

148.    Relator believes and avers that he is an original source of the facts and information on which this action is based.

### COUNT VII
### VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT
(Presentation of False Claims/Making or Using False Record or Statement)
(N.J. Stat. § 2A:32C-1 *et seq*)

149.    ███████████████ realleges and incorporates the foregoing allegations as if the same were set forth herein.

150.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.

151.    The New Jersey False Claims Act provides liability for any person who, inter alia, "[k]nowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval."

152.    As a result, Defendants violated the New Jersey False Claims Act and caused the State of New Jersey to suffer actual damages.

Case 1:11-cv-07543-JBS-AMD   Document 21-2 *SEALED* Filed 02/07/17   Page 29 of 30   PageID: 319
Case 1:11-cv-07543-JBS-AMD   Document 21-2 *SEALED* Filed 06/29/16   Page 30 of 31
PageID: 235

153.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

154.    Defendants knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by State of New Jersey.

155.    The New Jersey government, unaware of the falsity of the records and claims caused to be made by Defendants, pay, and continue to pay, claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

156.    By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator, on behalf of the United States and the State of New Jersey, demands and prays that judgment be entered in its favor against Defendants as follows:

1.      Counts 1, 2 and 3 under the False Claims Act for the amount of statutory damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      Count 4 for unjust enrichment, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.       Counts 5 and 6 under the False Claims Act, as amended, for the amount of statutory damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper. and

4.       Count 7 under the New Jersey False Claims Act for the amount of statutory damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Dated:  April 2, 2012

Respectfully submitted,

Brian J. McCormick, Jr., Esquire
**SHELLER, P.C.**
1528 Walnut Street, Floor 4
Philadelphia, PA  19102
Tel.: (215) 790-7300
Fax: (215) 546-0942
bjmccormick@sheller.com

Attorneys for ▇▇▇▇▇▇▇▇▇▇